51 CCPA
**Application of Gilbert C. SITZ.**
**Patent Appeal No. 7179.**

United States Court of Customs and Patent Appeals.

May 14, 1964.

Roger L. Hansel, Washington, D. C., John R. Hopkins, Harrisburg, Pa. (William Hintze, Marshall M. Holcombe, Harrisburg, Pa., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (George C. Roeming, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

MARTIN, Judge.

This appeal is from a decision of the Board of Appeals affirming the examiner's rejection of claim 10 of appellant's application serial No. 75,645, filed December 13, 1960 for reissue of his patent No. 2,927,295 issued on March 1, 1960 on application serial No. 411,969, filed February 23, 1954. Of appellant's ten claims in serial No. 75,645, claims 1 to 9, which correspond to the claims of patent No. 2,927,295, stand allowed. Appealed claim 10 was copied without change from patent No. 2,866,046, to G. J. Pandapas, issued December 23, 1958, on an application filed March 23, 1956.

Appellant's invention "generally relates to plugboard assemblies for electrical accounting machines, computers and the like, and in particular to the mechanism and contact assembly for effecting an operative interconnection between the movable plugboard and fixed plugboard of such assemblies." The coupling mecha-

nism for appellant's plugboard assemblies is' in the general form of a sliding block linkage which is further characterized in that the linkage is stopped in an over-center position when the assembly is interconnected. Means are provided to render the sliding block action of the linkage ineffective until the movable plugboard is brought to a position parallel to the fixed plugboard with the respective contacts being in an overlapping spaced relationship. The linking mechanism is said to be then operative during movement to dead center to lift the movable plugboard thereby causing a set of contact plugs on the movable board to engage and wipe a cooperating set of spring contacts on the fixed plugboard. Movement of the linkage mechanism overcenter is said to complete the interconnection of the assembly and to result in a slight dropping of the movable plugboard which partially withdraws the plug contacts along the path of wiping action for insuring final contact engagement at a point of good electrical conductivity.

Reproduced below are Figures 1 and 8 of appellant's application.

Fig. 1

Fig. 8

Figure 1 is a perspective view of a preferred embodiment of appellant's plugboard assembly with certain parts broken away for the purpose of clarity. Figure 8 is a side view of the contact assembly, when engaged, of that plugboard.

Referring to Figures 1 and 8, a fixed plugboard panel A of any suitable electrical insulating material is provided with rows and columns of apertures 1 which are adapted to receive therein a set of spring contact members 2. Contact members 2 are the terminals for the leads which electrically couple the fixed panel to the sensing elements and the operative instrumentalities of a computing machine or the like. Cooperating with contact members 2 to effect the desired circuit interconnections within such a computing machine is a set of plug contact members 3 that are adapted to be received by a plurality of apertures 4, corresponding to apertures 1, in control plugboard panel B, which panel also is of suitable insulating material. Each plug contact 3 includes a barrel portion 41 which is detachably maintained within apertures 4 "by any suitable means known in the art," as, for example, "a friction grip between barrel 41 and the sidewalls of aperture 4." Integrally connected at the opposed end of barrel 41 are ferrule 42 and plug pin 43, ferrule 42 providing the means by which the plugs are connected to the electrical connecting leads therebetween and plug pin 43 constituting the electrical contact portion of the plug.

To permit the control panel to be detached from the plugboard assembly, panel B is slidably mounted in channels 6 of a rotatable carrier frame 7 loosely pivotally mounted at the base of a fixed frame 9 in which the plugboard panel A is mounted and by which the plugboard assembly is supported on a computing machine or the like. Pivotal movement of the carrier frame 7 carries the control panel B to a position parallel to fixed panel A, and subsequent rectilinear motion thereof along the fixed plugboard is effective to cause engagement of the sets of contacts.

The linkage mechanism which is operative to control the movement of the carrier frame 7 generally includes a crank arm that is pivotally connected at one end by pin 11 to a connecting link 12 and at the other end carries a pivot pin 13 that is coupled to a carrier frame 7, projecting into a longitudinal slot 14 intermediate the length thereof. At the base of fixed frame 9 is an outwardly extending projection 16 that is provided with an upwardly extending slot through which a pivot pin 18, fixed at the base of carrier frame 7, projects to provide a loose pivotal coupling between the plugboards. Connecting link 12 is also pivotally coupled to carrier frame 7 and loosely coupled to fixed frame 9 by pivot pin 18, and extends beyond pin 11 to provide an operating lever for the coupling mechanism. The linkage mechanism is said to act "substantially in the nature of a sliding block mechanism, carrier frame 7 and control panel B being similar to the block which in operation slides along fixed frame 9, but with a floating pivot for the crank * * * arm whereby carrier frame 7 may be pivoted so as to move control panel B to a readily accessible position."

Upon operation of the linkage mechanism to bring the movable plugboard to a position parallel to the fixed plugboard and prior to initiation of a lifting action, the respective contact elements are said to be in a parallel spaced relationship. As the operation continues to cause the movable plugboard to travel upwardly along the fixed plugboard, pin contact 43 advances toward and into initial engagement with tab contact 48 and further movement of the movable plugboard causes pin contact 43 to flex leaf spring 45 while wiping contact tab 48. The tab 48 is said thus to be rendered free of foreign matter, such as dust, dirt, corrosion, etc., along the path of wiping engagement. The limit of the path of wiping action is said to be determined by the linkage mechanism reaching dead center. The extent to which pin contact 43 may be retracted along the pre-wiped path

on tab 48 is determined by the degree of overcenter movement of the linkage mechanism. In the retracted position pin 43 engages tab 48 at a pre-wiped point insuring good electrical contact.

The invention in the Pandapas patent is said to relate "in general to relays which include switch contact elements at least one of which is actuated by a prime actuating mechanism such as an electro-magnetic device, so as to cause engagement and disengagement of said contact elements and thereby close and open a circuit, respectively, and the invention is especially useful in relays for low voltage, low current electrical circuits."

Reproduced below is Figure 2 of the patent.

Figure 2 is a central vertical sectional view approximately on the plane of a line drawn through the center of a top plan view of a relay constructed in accordance with the invention in the Pandapas patent.

The relay is shown as comprising an actuating mechanism A including a coil

1, a fixed core 2 and a coaxial movable core 3 arranged in a case 4 so that the movable core 3 is drawn toward the fixed core upon passage of the electric current through the coil 1. The fixed core 2 has a coaxial opening 5 in which a plunger 6 is reciprocable. One end of said plunger is said normally to abut the movable core 3 while the other end has connected thereto a motion-transmitting device E for transmitting motion from the core 3 to a plurality of movable electrical contact elements generally designated B. Each of the contacts B cooperates with a pair of fixed contact elements C which in turn are secured by insulating bushings 7 in a head plate 8 which closes one end of a main casing D wherein the electromagnetic device and the contact elements are housed. The plunger 6 is normally biased by a compression spring 9 in the direction to actuate the movable core 3 away from the fixed core 2 when the coil 1 is de-energized.

Movable contact elements B each cooperates with two fixed contact elements C. Each movable contact element includes a spring portion 22 and an elongate contact surface 26 related to elongate contact surfaces 27 of the fixed contact elements and to the motion-transmitting device E. Each movable contact surface 26 is disposed obliquely to the general directions of movement of the motion-transmitting device in a common plane therewith and also obliquely to the general directions of movement of the contact surfaces into and out of mutual contact. Upon movement of the motion-transmitting device in either of opposite directions in a predetermined path, the contact surface of the movable contact element will move toward and into contact with one of the two corresponding fixed contact elements and away from the other. Upon continued movement of the motion-transmitting device in the same direction the contact surface of the movable contact element will move both transversely and longitudinally in sliding contact with the contact surface of the

first-mentioned fixed contact element and under constantly increasing pressure.

The contact surfaces 27 of each pair of fixed contact elements are said to be spaced apart so that the contact surface 26 of the corresponding movable contact element is normally in contact with one of the fixed contact surfaces 27 when the electromagnet is de-energized, as shown in Figure 2. Upon energization of the electromagnet, the core 3 will drive the motion transmitting device E upwardly to actuate the movable contact element and move the movable contact surface 26 into engagement with the contact surface 27 of the other fixed contact element. It is stated in the Pandapas patent that:

"A highly important feature of the invention is that due to the spring portion 22 of the movable contact element and due to the relative movement possible between the motion-transmitting device E and the movable contact element, the movable contact surface 26 is caused to move in a direction angularly related to the general directions of movement of the contact surfaces into and out of mutual contact and to slide with a wiping action along each fixed contact surface 27 as said surfaces are moved into and out of engagement with each other. * * *

"This relatively sliding engagement will reduce bouncing of the movable contact and will remove from both the fixed and the movable contact surfaces all foreign matter, such as grease, dust and oxides, the point at which the contact surfaces engage each other during the current transmission being different from the points at which the contact surfaces engage and disengage each other, thereby ensuring clean surfaces for perfect conductivity and current transmission. * * *"

Appealed claim 10 stands rejected on two grounds: (1) that it is barred to appellant by 35 U.S.C. § 135[1] because

1. 35 U.S.C. § 135 reads:
"§ 135. Interferences
* * * * * *

"A claim which is the same as, or for the same or substantially the same subject matter as, a claim of an issued pat-

it was made on December 13, 1960, more than one year after the December 23, 1958 issuance date of the Pandapas patent, and appellant was not claiming "the same" or "substantially the same subject matter" at some time prior to one year after the issuance of the Pandapas patent, and (2) appellant has made a "constructive prior election" by an earlier cancellation of claims 9 and 23 in his application serial No. 411,969 before the issuance of the patent thereon, which election precludes the present assertion of claim 10 by way of reissue.

Appellant asserts that his original claims 9 and 23 in his application serial No. 411,969 were for substantially the same subject matter as appealed claim 10 and were pending before the Patent

Office during the "critical period." Appellant further urges that his alleged "constructive prior election" is not inconsistent with his present assertion of claim 10.

The case involves the question whether appellant's claims 9 and 23 in his serial No. 411,969 were for substantially the same subject matter as appealed claim 10. If we find that they are not, the question whether appellant is precluded from asserting claim 10 by way of reissue becomes moot.

For purposes of comparison appealed claim 10, which corresponds to claim 11 of the Pandapas patent, as well as appellant's original claim 23 of his serial No. 411,969 are reproduced below in outline form.[2]

| "Claim 10 | "Claim 23 |
|---|---|
| "An electric switch | "In an interconnecting plugboard assembly, |
| including two contact elements having relatively movable portions each of which carries a contact surface, means mounting said elements and | a fixed plugboard having a set of spring contacts, <u>a movable plugboard mounted in said assembly</u> at least in part for sliding rectilinear movement relative to said fixed plugboard and having a set of plug contacts adapted to engage and flex said spring contacts upon interconnection of said plugboards, said <u>movable plugboard</u> having a contact disengaged position with the respective contacts being in an overlapped space relationship, |
| actuating means movable alternately in opposite directions in a predetermined path and connected to at least one of said elements for relatively moving said contact surfaces into and out of mutual contact, respectively, | operating means for sliding said <u>movable plugboard</u> along said <u>fixed plugboard</u> for causing said respective contacts to engage, |

ent may not be made in any application unless such a claim is made prior to one year from the date on which the patent was granted."

2. We shall limit our remarks to appellant's claim 23 of his serial No. 411,969 since we agree with the board that claim 23

is a closer approach to the subject matter of claim 10 than is claim 9 of appellant's serial No. 411,969, which includes an operating mechanism which functions to position the plugboard into parallelism with the stationary contact devices.

"Claim 10

"An electric switch

each of said elements having its contact surface elongated and one contact surface being disposed obliquely to said path of movement of the actuating means and in a common plane therewith, said mounting means and said actuating means providing for over-travel and relative sliding of said contact surfaces after movement thereof into mutual contact, and there being resilient means associated with at least one of said contact elements providing for mutual relative sliding contact of said contact surfaces transversely and longitudinally of said elongated surfaces, with a wedge action under constantly increasing yielding pressure during overtravel of said contact surfaces after mutual contact thereof."

"Claim 23

"In an interconnecting plugboard assembly,

each of said spring contacts having a contact surface parallel to the cooperating plug contacts and inclined with respect to the direction of movement thereof for causing said contacts relatively to slide during flexure of said spring contacts upon sliding of said <u>movable plugboard</u> to contact engaged position, the bending axis of said spring contacts being parallel to said direction of movement." [Emphasis ours.]

Both claims read on a device that can be used to complete or interrupt an electric circuit. Also no question has been raised by the Patent Office as to the readability of claim 10 on appellant's disclosure.

The examiner, in finding that appellant was not claiming substantially the same subject matter as a claim of the Pandapas patent, stated:

" * * * The two devices—Sitz's removable plugboard and Pandapas' switch—are two distinct species of a generic group of devices that can be used to complete or interrupt an electric circuit. Further, each has attained a separate status in the art. * * * In the Pandapas device every movement of the movable contact will open and close the same contacts in the same sequence. In appellant's plugboard every movement of the movable plugboard will not necessarily open and close the same contracts. It will depend upon which 'plug contacts' the operator wishes to include in the circuit. * * *"

In affirming the examiner on this point the board stated:

"While we recognize that there are certain structural features in common between appellant's plugboard assembly and the relay switch of Pandapas, we are inclined to agree with the position of the Examiner that the devices are sufficiently different that a holding that appellant was claiming substantially the same subject matter in the critical period, would be untenable. * * *"

It is immediately apparent that claim 23 does not read on the relay structure disclosed in the Pandapas patent. While the lack of readability is some indication that the claim is not drawn to the same, or substantially the same, invention as the claim copied from the patent, it is not conclusive. Stalego v. Heymes, 263 F.2d 334, 46 CCPA 772. Hence, it becomes necessary to compare the structures recited specifically in claim 23 with the broader recitations of claim 10 in light of the disclosure of the Pandapas patent where claim 10 originated.

On a close comparison of claims 10 and 23, supra, we agree with the board that the subject matter of the latter is directed to an invention that is not substantially the same as the invention claimed in the Pandapas patent. We find nothing in the Pandapas patent that would suggest the *entire* invention as embodied in the combination of a *fixed plugboard* and a *movable plugboard* recited in appellant's claim 23, which elements we think on the basis of appellant's disclosure, are material parts of the claimed subject matter.

The opening statements of appellant's application disclose that his invention generally relates to plugboard assemblies for electrical accounting machines, computers and the like, and in particular to the mechanism and contact assembly for effecting an operative interconnection between the *movable plugboard* and *fixed plugboard* of such assemblies. Appellant then refers to the "prevailing practice" of providing in electrical computing machines a fixed panel and a control panel, the control panel cooperating with the fixed panel to furnish circuit connections. He further makes reference to the disadvantages in mechanisms of the prior art for interconnecting the plugboards. Among the stated objects of appellant's invention are an improved plugboard coupling mechanism for plugboard assemblies, an improved locking arrangement for the coupling mechanism of plugboard assemblies and a plugboard assembly "wherein the contacts are first caused to wipe clean a path thereon during interconnection of the assembly then caused to engage at a pre-wiped intermediate point on said path." Appellant further states:

"These objects are generally attained by the provision of a coupling mechanism for plugboard assemblies in the general form of a sliding block linkage which is further characterized in that the linkage is stopped in an overcenter position when the assembly is interconnected. Means are provided to render ineffec-

tive the sliding block action of the linkage until the movable plugboard is brought to a position parallel to the fixed plugboard with the respective contacts being in an overlapping spaced relationship. The linkage mechanism is then operative during movement to dead center to lift the movable plugboard, similarly to a sliding block, thereby causing a set of contact plugs on the movable board to engage and wipe a cooperating set of spring contacts on the fixed plugboard. Movement of the linkage mechanism overcenter completes the interconnection of the assembly and results in a slight dropping of the movable plugboard which partially withdraws the plug contacts along the path of wiping action for insuring final contact engagement at a point of good electrical conductivity. In addition the tension of the spring contacts acting through the plug contacts and movable plugboard biases the linkage mechanism overcenter which maintains the assembly interconnected."

The only specific embodiment in appellant's application relates to a plugboard assembly comprising a fixed and movable plugboard and associated with the improved coupling mechanism.

On the other hand, the invention in the Pandapas patent "relates in general to relays which include switch contact elements at least one of which is actuated by a prime actuating mechanism such as an electromagnetic device." It does not refer to or appear to contemplate a plugboard assembly as recited in appellant's claim 23. It is true that the relatively sliding engagement of the contacts in the Pandapas device is said to remove from both the fixed and movable contact surfaces all foreign matter and, as appellant urges, both claim 23 and claim 10 have as an object the closing of circuit paths between contacts. However, we think claim 23 differs so widely in scope from the subject matter claimed in the Pandapas patent that the invention

claimed in appellant's claim 23 is not substantially the same as that defined in the claim copied from the Pandapas patent.

Since we find that appellant was not claiming substantially the same subject matter as the claim in issue prior to one year after the issuance of the Pandapas patent, we find it unnecessary to consider whether appellant has made a "constructive prior election" which precludes his present assertion of claim 10 by way of reissue.

For the foregoing reasons the decision of the board is affirmed.

Affirmed.